## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Mujahid Mohammad

    v.                                        Case No. 10-cv-254-JL

Michael J. Astrue, Commissioner,
Social Security Administration

### REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Mujahid Mohammad moves to reverse the Commissioner's decision denying his application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Commissioner, in turn, moves for an order affirming his decision. I recommend that this matter be remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this report and recommendation.

### Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB
decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §
405(g) as the standard of review for SSI decisions).  However,
the court "must uphold a denial of social security . . .
benefits unless 'the [Commissioner] has committed a legal or
factual error in evaluating a particular claim.'"  Manso-Pizarro
v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting
Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

     As for the statutory requirement that the Commissioner's
findings of fact be supported by substantial evidence, "[t]he
substantial evidence test applies not only to findings of basic
evidentiary facts, but also to inferences and conclusions drawn
from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916,
917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727,
730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more
than [a] mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st
Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)).  But, "[i]t is the responsibility of the [Commissioner]
to determine issues of credibility and to draw inferences from
the record evidence.  Indeed, the resolution of conflicts in the
evidence is for the [Commissioner], not the courts."  Irlanda

Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir 1991)
(citations omitted).  Moreover, the court "must uphold the
[Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529,
535 (1st Cir. 1988).  Finally, when determining whether a
decision of the Commissioner is supported by substantial
evidence, the court must "review[] the evidence in the record as
a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v.
Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material
Facts (document no. 11).  That statement is part of the court's
record and will be summarized here, rather than repeated in
full.

Mohammad has worked as a grocery-store clerk and as a food
server.  He stopped working on December 5, 2005, because he was
having seizures at work and on the way home from work.

On March 16, 2005, Mohammad was diagnosed with seizure
disorder during the course of a visit to the Catholic Medical
Center ("CMC") emergency room ("ER").  Administrative Transcript
(hereinafter "Tr.") 209.  That visit was the third of eight that
Mohammad made to the ER at CMC between February 2, 2005, and
November 29, 2007.  He went to the ER with complaints of

3

seizures or a lack of seizure medication.  As a result of those
visits, Mohammad received the following diagnoses: (1) February
2, 2005, "[p]ossible seizures versus anxiety reaction," Tr. 189;
(2) March 16, 2005, seizure disorder, Tr. 209; (3) May 7, 2005,
"PRIMARY: seizure disorder ADDITIONAL: noncompliance with
medications,"[1] Tr. 223; (4) May 25, 2005, "PRIMARY: Medication
Noncompliance ADDITIONAL: Seizure Disorder,"[2] Tr. 231; (5)
November 7, 2007, breakthrough seizure,[3] Tr. 366; and (6)
November 29, 2007, seizure, Tr. 375.[4]

Mohammad made another nine visits to the Elliot Hospital ER
between November 18, 2005, and March 1, 2008, complaining of
seizures or a lack of seizure medication.  Those ER visits
resulted in the following diagnoses: (1) November 18, 2005,

---

[1] Regarding Mohammad's non-compliance, the CMC Emergency
Record includes the following note: "patient ran out of dilantin
because he can't afford it."  Tr. 221.

[2] Regarding Mohammad's non-compliance, the CMC Emergency
Record includes the following note: "Pt. states that he hasn't
had his Dilantin for 48 hours.  States that he hasn't had the
money to buy the medication."  Tr. 230.
    Dilantin is a "trademark for preparations of phenytoin."
Dorland's Illustrated Medical Dictionary (hereinafter
"Dorland's") 527 (31st ed. 2007).  Phenytoin is "[a]n
anticonvulsant used in the treatment of generalized tonic clonic
and complex partial epilepsy."  Steadman's Medical Dictionary
(hereinafter "Steadman's") 1367 (27th ed. 2000).

[3] Mohammad suffered the November 7 seizure despite having a
therapeutic level of Dilantin in his blood.  Tr. 368.

[4] Mohammad also visited the ER at CMC on February 23, 2005,
and August 14, 2006, to get refills of prescriptions for anti-
seizure medications.  Tr. 203, 361.

seizure, Tr. 251; (2) September 9, 2006, seizure disorder, Tr. 355; (3) November 5, 2007, seizure,[5] Tr. 328; (4) November 6, 2007, seizure—noncompliance, Tr. 324; (5) November 24, 2007, seizure disorder, Tr. 321; (6) December 31, 2007, seizure, Tr. 318; (7) January 20, 2008, seizure, generalized, grand mal, with subtherapeutic Dilantin level, Tr. 391; (8) January 26, 2008, seizure, Tr. 387; (9) March 1, 2008, seizure, Tr. 382.

The record also includes a July 29, 2008, Emergency Room Note from a hospital in Massachusetts where Mohammad suffered a seizure while visiting his brother.  Tr. 448.

In addition to going to various emergency rooms when he suffered from seizures, Mohammad also received treatment for his seizures from Dr. Mark Biletch, of Neurology Associates of Southern New Hampshire (December 2, 2005, through December 11, 2006) and Dr. Lisa Plotnik (starting on March 13, 2008).  Dr. Plotnik, in turn, referred Mohammad to another neurologist, Dr. Keith McAvoy, who examined Mohammad on June 24, 2008.

During the year he treated Mohammad, Dr. Biletch expressed concern on several occasions about Mohammad's failure to take his prescribed medications and the contribution of non-compliance to the poor control of Mohammad's seizures.[6]  On June

---

[5] The November 5 seizure was still going on when Mohammad arrived at the Elliot ER.

[6] Specifically, Dr. Biletch recorded the following impressions: (1) March 30, 2006: "Epilepsy – unspecified.  It on

20, 2006, Dr. Biletch told Mohammad that if he "continue[d] to be less than compliant in getting his testing and followup as recommended," he risked being terminated from Dr. Biletch's practice.  Tr. 413-14.  On December 11, 2006, Dr. Biletch terminated Mohammad as a patient, noting that his "failure to follow through with appointments, testing and prescriptions [made] it difficult to give [him] good care for [his] epilepsy."[7] Tr. 429.

---

the surface would appear he has been poorly controlled, although it would seem that much of this may relate to lack of compliance with Dilantin in the past.  He nonetheless says that he has been recently compliant and it is not clear if this is accurate," Tr. 298; (2) May 11, 2006: "Epilepsy-NOS.  Imperfectly controlled, although this may reflect compliance issues more than anything else as it would really be quite extraordinary to need much more than 600 mg [of Dilantin] to achieve a level over 10. Nonetheless, this rarely happens, though I have to suspect noncompliance as being the major issue," Tr. 300; (3) June 20, 2006: "Unfortunately, the lack of control appears more related to compliance issues than necessarily medication failure," Tr. 413; and (4) October 10, 2006: "On the surface this again appears to be epilepsy, perhaps PCE, with incomplete control; though I have to wonder with his varying levels about compliance issues.  One could ask if the diagnosis of epilepsy has been clearly documented.  Nonetheless, it does seem appropriate to press on with a 2nd anticonvulsant to try to get better control," Tr. 424.

[7] In the office note that preceded Mohammad's termination from Dr. Biletch's practice, the doctor observed: "Apparently [Mohammad's] Medicaid has run out and his father is paying for the medications though hoping to reapply for coverage."  Tr. 424.

The record also includes three office notes from Dr. Plotnik (dated March 13, April 3, and May 23, 2008), along with one from Dr. McAvoy (dated June 24, 2008).  In the office note resulting from Mohammad's second visit with Dr. Plotnik, she reported:

> Has been doing well since starting the phenobarbital – has had less seizures since starting the phenobarbital.  However he is very tired – sleeping about 14 hours a nighttime.  Has had 1 witnessed seizure lasting 2-3 minutes while sleeping.  Has woken up having urinated while sleeping 3 times since last visit.
>
> Had 1 episode while showering 5 days ago when he "spaced out" while showering – slipped and thinks he lost about 5 minutes – not sure if he fell asleep but reinjured his right knee again . . . Taking his Dilantin twice daily without forgetting – his dad reminds him to take it.

Tr. 437.  After Mohammad's next office visit, Dr. Plotnik reported:

> Doing better on his medications – has had only 2 grandmal seizures – both in the same day. . . .  Has had 2 episodes of smaller seizures while sleeping as he found the bed was wet. . . .  Taking his medications diligently.

Tr. 442.

During the course of his treatment for seizures, Mohammad has had one or more CT scans of his brain, MRIs of his brain, and EEGs, all of them normal.  His treatment, from the ERs and all three doctors, has consisted exclusively of medication,

7

including Dilantin, Carbamazepine,[8] Depakote,[9] Keppra,[10] and
Phenobarbital.[11]  In a June 10, 2008, letter to Mohammad's
counsel, Dr. Plotnik described Mohammad's medication history:

> He has had his dilantin dosing increased dramatically,
> starting from 300mg daily up to 700mg twice daily
> (much higher than most patients need) due to his rapid
> metabolism of the medication (his body breaks down the
> medication much faster than some other patients).
> Despite taking 700mg twice daily his drug levels have
> been subtherapeutic despite having improvement in
> seizure control but without complete control of the
> seizures.  Additionally, he was started on
> phenobarbital in April and the dosage was increased to
> 120mg at bedtime.  He has been significantly sedated
> during the daytime due to the phenobarbital.

Tr. 432.  Approximately two weeks after Dr. Plotnik wrote the
letter quoted above, Dr. McAvoy increased Mohammad's dosage of
phenobarbital from 120mg per day to 180mg per day.  Tr. 446.

In a Physical Residual Functional Capacity Assessment
completed on May 31, 2006, state-agency medical consultant Karen
Keller determined that Mohammad had no exertional, manipulative,

---

[8] Carbamazepine is "[a]n anticonvulsant." Steadman's 283.

[9] Depakote is a "trademark for a preparation of divalproex
sodium." Dorland's 497.  Divalproex sodium is "an
anticonvulsant used in absence seizures and related seizure
disorders." Steadman's 532.

[10] Keppra is a "trademark for a preparation of
levetiracetam." Dorland's 992.  Levetiracetam is "an
anticonvulsant administered orally as an adjunct in the
treatment of partial seizures in adults with epilepsy." Id.
1046.

[11] Phenobarbital is "[a] long-acting oral . . . sedative,
anticonvulsant, and hypnotic . . . used in the therapeutic
management of epilepsy." Steadman's 1363.

visual, or communicative limitations, one postural limitation
(he can never climb ladders, ropes, or scaffolds), and one
environmental limitation (he should avoid concentrated exposure
to hazards such as machinery and heights).  Tr. 165-72.  She
concluded: "When compliant with medical treatment, [Mohammad]
can perform a full range of work and daily activities that do
not require driving, working at heights or around unprotected
machinery.  No other restrictions apply." Id. at 172.  A
Psychiatric Review Technique form dated October 1, 2007,
includes nothing other than a mark in the box labeled
"Insufficient Evidence."  Tr. 302.

     In the office note that resulted from Dr. Plotnik's first
examination of Mohammad, the assessment section includes a
notation that Mohammad "is currently unable to hold a job due to
the difficulty controlling his seizures."  Tr. 436.  In the June
10 letter quoted above, Dr. Plotnik opined that Mohammad's
seizure disorder met the listing criteria for both convulsive
epilepsy (listing 11.02) and nonconvulsive epilepsy (listing
11.03).  Tr. 432.  In an undated letter to whom it may concern,
Dr. Plotnik offered her opinion that Mohammad was "unable to
maintain employment due to his seizure frequency."  Tr. 431.

     On several occasions, Dr. Biletch advised Mohammad, or
others, that Mohammad should not drive, operate heavy equipment,
or work at heights or in other dangerous situations.  Tr. 297,

412, 425.  Notwithstanding those limitations, however, Dr. Biletch also opined that "[t]here are presumably some work settings that would not be problematic within these limitations," Tr. 412, and that Mohammad "would, however, not be generally restricted from doing something like clerical work, etc.," Tr. 425.

Finally, at his hearing, Mohammad offered his own testimony along with that of a friend he saw almost daily for the seven or eight months leading up to the hearing.  Tr. 77.  They both described Mohammed's seizures, including their frequency, their onset, and their after effects.  Those after effects include being tired in the morning and having trouble waking up after a nighttime seizure, and needing to relax for several hours after a daytime seizure.  He further reported that even though he was taking the medications prescribed to him, he had a seizure three days before the hearing that was severe enough that he went to the hospital, Tr. 68, and that he had been to the hospital with seizures twice in the preceding thirty days, Tr. 72.

He explained that he sometimes did not take the medications prescribed to him because he could not afford them.  Tr. 59-60.  He also said that he missed appointments with Dr. Biletch and failed to follow up on testing that Dr. Biletch ordered because of his inability to get to the doctor's office or hospital and/or his lack of health insurance.  Tr. 62-63.

After the hearing, the ALJ made a decision that includes the following findings of fact and conclusions of law:

> 3. The claimant has the following medically determinable impairment: a seizure disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> . . . .
>
> 4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 and 416.921).
>
> . . . .
>
> 5. The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2005 through the date of this decision (20 CFR 404.1520(c) and 416.920(c)).

Tr. 19, 20, 22.

To support his determination that Mohammad did not have a severe impairment, the ALJ found Mohammad's statements about his symptoms not to be credible to the extent they were inconsistent with a finding that he did not have a severe impairment.  Tr. 21-22.  The ALJ also noted the following evidence from the record that cast doubt on Mohammad's credibility: (1) Mohammad's negative EEG, MRI, and CT testing; (2) his history of non-compliance with medication; (3) Dr. Biletch's opinion that Mohammad was not unable to work but needed only to avoid driving and certain hazards; (4) Mohammad's minimal medical treatment in 2007; (5) Dr. McAvoy's concerns about both the correctness of

11

Mohammad's previous diagnoses and Mohammad's lack of compliance with treatment, including medication;[12] and (6) a lack of any description or documentation of Mohammad's seizure activity. Tr. 22.  While it is difficult to tell, it would appear that the ALJ's determination of non-severity rests entirely on his finding that Mohammad's "statements concerning the intensity, persistence and limiting effects of [his alleged] symptoms are not credible to the extent they are inconsistent with findings that [Mohammad] has no severe impairment."[13]  Tr. 22.

---

[12] While the ALJ placed considerable emphasis on Mohammad's lack of compliance, he also found, as a factual matter, that Mohammad "still has seizures even on strong medication," Tr. 21, which calls into question the analytical import of Mohammad's lack of compliance.  It is also far from clear that lack of compliance is even a step-two issue in the first place.  See Wasilauskis v. Astrue, Civ. No. 08-284-B-W, 2009 WL 861492, at *7 (D. Me. Mar. 30, 2009) ("The administrative law judge conflated two separate analyses: whether a condition is severe and whether compliance with treatment would restore a claimant's ability to work.") (citing McGuire v. Heckler, 589 F. Supp. 718, 723 n.34 (S.D.N.Y. 1984)); but see Pham v. Shalala, No. C-94-20745-JW, 1996 WL 411603, at *3 (N.D. Cal. July 16, 1996) (affirming step-two denial of benefits for seizure disorder where record supported findings that claimant was noncompliant with medication and that his "seizure activity was well controlled with medication compliance") (emphasis added); Aponte v. Barnhard, No. 02 Civ. 0014(NRB), 2003 WL 1702002, at *2-3 (S.D.N.Y. Mar. 31, 2003) (same).

[13] Given that "[a]n ALJ may find that a claimant lacks a medically severe impairment . . . only when his conclusion is 'clearly established by medical evidence,'" Padilla v. Astrue, 541 F. Supp. 2d 1102, 1106 (C.D. Cal. 2008 (quoting Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005)), it is not clear that a claimant's credibility has much of a bearing on a step-two determination.  See also McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1142 (1st Cir. 1986) (pointing out that step-two evaluation is based primarily upon medical evidence).

Necessarily, then, the findings listed above are directed toward the ALJ's credibility determination,[14] rather than toward an assessment of the severity of Mohammad's impairment.

### Discussion

According to Mohammad, the ALJ's decision should be reversed, and the case remanded, because the ALJ erroneously determined that his seizure disorder was not a severe impairment.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to

---

[14] In addition to making a negative assessment of Mohammad's credibility, the ALJ also noted that another witness, about whom he made no credibility determination, provided testimony that "essentially supported the claimant's testimony."  Tr. 21.  If another witness with no credibility issues corroborated Mohammad's testimony, it is difficult to understand what evidence, if any, the ALJ eliminated from his analysis as a result of his negative credibility determination.

Moreover, the lack of a credibility determination regarding the other witness is troublesome in its own right.  See Mitchell v. Comm'r of Soc. Sec., No. 2:08cv513, 2010 WL 282534, at *21 (E.D. Va. Jan. 22, 2010) (remanding for lack of substantial evidence supporting ALJ's step-two determination that claimant's seizure disorder was not severe impairment where, among other things, "ALJ failed to assess the credibility of [claimant's] mother's testimony").

income and assets.  42 U.S.C. § 1382(a).  The only question in

this case is whether Mohammad was under a disability.

For the purpose of determining eligibility for disability

insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A)

(setting out a similar definition of disability for determining

eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he
> applied for work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

In order to determine whether a claimant is disabled for

the purpose of determining eligibility for either DIB or SSI

benefits, an ALJ is required to employ a five-step process.  See

20 U.S.C. §§ 404.1520 (DIB) and 416.920 (SSI).

14

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

    The claimant bears the burden of proving that he is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

    [i]n assessing a disability claim, the [Commissioner]
    considers objective and subjective factors, including:
    (1) objective medical facts; (2) plaintiff's
    subjective claims of pain and disability as supported
    by the testimony of the plaintiff or other witness;
    and (3) the plaintiff's educational background, age,
    and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

    Mohammad argues that the ALJ erred because his step-two

determination, i.e., his determination that Mohammad did not

suffer from a severe impairment, was not supported by substantial evidence.  The Commissioner disagrees.

The regulations governing step two provide that if a claimant does not have a severe impairment that meets the durational requirement, he or she is not disabled.  20 C.F.R. §§ 404.520(a)(4)(ii), 416.920(a)(4)(ii).  More specifically, "[i]f [a claimant] do[es] not have any impairment . . . which significantly limits [his or her] physical or mental ability to do basic work activities, [the Commissioner] will find that [the claimant] do[es] not have a severe impairment and [is], therefore, not disabled."  20 C.F.R. §§ 404.1520(c), 416.920(c).  "An impairment . . . is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1421(a), 416.921(a).  Finally, examples of basic work activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b).

It is well established in this circuit "that the Step 2 severity requirement is . . . to be a de minimis policy,

designed to do no more than screen out groundless claims."
McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124
(1st Cir. 1986).  Under Social Security Ruling 85-28, "a finding
of 'non-severe' is only to be made where 'medical evidence
establishes only a slight abnormality or combination of slight
abnormalities which would have no more than a minimal effect on
an individual's ability to work."  McDonald, 795 F.2d at 1124.
In other words, proper application of step two should "do no
'more than allow the [Commissioner] to deny benefits summarily
to those applicants with impairments of a minimal nature which
could never prevent a person from working.'"  Id. at 1125
(quoting Baeder v. Heckler, 768 F.2d 547, 553 (3d Cir. 1985))
(emphasis added).

     Here, the record does not contain "such relevant evidence
as a reasonable mind might accept as adequate," Currier, 612
F.2d at 597, to support the ALJ's conclusion that Mohammad's
seizure disorder was such a slight abnormality that it "could
never prevent a person from working," McDonald, 795 F.2d at
1125.  Under the right set of circumstances, a claim based on an
alleged seizure disorder could be correctly denied at step two,
but the facts of this case bear no resemblance to those in cases
where claimants alleging seizure disorders failed to carry their
burdens of establishing a severe impairment.

For example, in James v. Astrue, the court affirmed the ALJ's determination that an alleged seizure disorder was not a severe impairment in the following circumstances:

> Although an MRI of Plaintiff's brain was normal, a twenty-four hour EEG showed multiple episodes of a tic, eyes wanting to cross, and hands and arms shaking.  Thus, there is some objective medical evidence that supports Plaintiff's complaints of seizure-like symptoms.  However, Plaintiff was never diagnosed with a seizure disorder.  Plaintiff's neurologist, Dr. Tatum, doubted that the symptoms were epileptic in origin, and he thought the symptoms might be caused by medication Plaintiff was taking.

No. 8:10-CV-472-T-27EAJ, 2010 WL 6192326, at *2 (M.D. Fla. Dec. 9, 2010) (citations to the record omitted).  Here, by contrast, Mohammad was diagnosed by several physicians, including at least one neurologist, as having a seizure disorder, and he was prescribed multiple anticonvulsant medications.  In Blevins v. Apfel, the court affirmed a step-two determination of non-severity where the claimant had been diagnosed with benign rolandic epilepsy, but her "treating physician . . . a neurologist, consistently reported that she had no seizure activity, had not had any for over a year (information gained from [claimant's] mother), and that she would, most likely outgrow the seizures."  No. Civ.A. 99-0217-BH-M, 2000 WL 284205, at *2 (S.D. Ala. Feb. 22, 2000).  Here, there is credible evidence that Mohammad was having seizures right up until several days before his hearing, and the ALJ supportably found,

as a factual matter, that he continued to have seizures "even on strong medication."

The vast majority of the other step-two determinations that went against claimants alleging seizure disorders, and that withstood judicial review, are of a piece with James and Blevins.  See Rivera v. Astrue, 280 F. App'x 190, 191 (3d Cir. 2008) (affirming ALJ's determination that seizure disorder was not severe impairment "because the seizures occurred very infrequently and did not result in any continuing limitations or treatment"); LeBlanc v. Chater, 83 F.3d 419 (unreported table decision), 1996 WL 197501, at *1 (5th Cir. 1996) (affirming ALJ's determination that seizure disorder was not severe impairment where claimant suffered no seizures for more than five years after receiving diagnosis and beginning treatment); Bauer v. Astrue, Civ. No. 2: 10-161-DCR, 2011 WL 675387, at *2 (E.D. Ky. Feb. 16, 2001) (affirming ALJ's determination that seizure disorder was not severe impairment where "claimant has stated that she had one grand mal seizure secondary to an asthma attack in 1997 [but] the record contain[ed] no documentation, treatment, or medication for seizures"); Davis v. Astrue, Civ. No. 09-3062, 2010 WL 4269375, at *28 (W.D. Ark. Oct. 25, 2010) (affirming ALJ's determination that seizure disorder was not severe impairment where one doctor "concluded that [claimant] was faking seizures [to get out of jail] and diagnosed him with

19

pseudo seizures" and second doctor "also concluded that
[claimant's] seizure disorder was a ruse"); Effler v. Astrue,
Civ. No. 08-1596, 2009 WL 6346492, at *9 (E.D. La. Dec. 16,
2009) (affirming ALJ's determination that seizure disorder was
not severe impairment where claimant "did not allege seizures as
a disabling impairment, . . . denied seizures when seen by the
consultative examiner," sought no treatment for seizures until
several days before his hearing, and never took seizure
medication prior to that time); Miller v. Astrue, 2009 WL
2568571, at *9 (N.D.N.Y. Aug. 19, 2009) (affirming ALJ's
determination that seizure disorder was not severe impairment
where claimant had not had seizure for seven years); Lange v.
Astrue, No. C07-5650FDB-KLS, 2008 WL 4889896, at *10 (W.D. Wash.
Nov. 12, 2008) (affirming ALJ's determination that seizure
disorder was not severe impairment where medical evidence
included only two references to seizures and "[a]t the hearing
the claimant reported that he had not had a seizure in quite a
while"); Dees v. Apfel, No. C-00-1250 VRW, 2001 WL 637417, at *5
(N.D. Cal. May 23, 2001) (affirming ALJ's determination that
seizure disorder was not severe impairment where evidence
included no eyewitness accounts of claimant's seizures, no
neurological testing, and no indication that claimant's
physicians ever reported claimant's alleged seizure disorder to
department of motor vehicles, as required by state law); DeMarco

v. Heckler, 616 F. Supp. 644, 646 (E.D. Pa. 1985) (affirming
ALJ's determination that seizure disorder was not severe
impairment where claimant "submitted no documentary evidence of
seizure activity since June of 1980, when she was placed on
Dilantin to control her seizure disorder"); but see Guinn v.
Chater, 83 F.3d 431 (unreported table decision), 1996 WL 211140,
at *1 (10th Cir. 1996) (affirming ALJ's determination that
seizure disorder was not severe impairment where only evidence
against severity was that "laboratory tests had failed to
establish a seizure disorder").

　　　In view of the decisions cited above and the factual record
in this case, the court has no difficulty concluding that the
ALJ erred by determining, at step two, that Mohammad's seizure
disorder was not a severe impairment.  Accordingly, the ALJ's
decision must be reversed, and the case remanded.  Moreover,
because remand is required even without consideration of
Mohammad's post-hearing medical records, there is no need to
address the parties' arguments about whether this court should
consider that material.

　　　Finally, the court takes this opportunity to observe that
in the event that Mohammad's credibility becomes an issue on
remand, the resulting decision would benefit from a slightly
more precise discussion of that issue.  As the ALJ correctly
points out, "whenever statements about the intensity,

persistence, or functionally limiting effects of pain or other
symptoms are not substantiated by objective medical evidence,
[an ALJ] must make a finding on the credibility of the
statements based on a consideration of the entire case record."
Tr. 21.  Accordingly, it is necessary to identify, with some
precision, both the particular symptom(s) about which a claimant
has made statements and the particular statements that are
discounted or rejected due to a claimant's lack of credibility.
In other words, a lack of credibility, standing alone or
inadequately linked to the relevant analysis, is not a
sufficient basis for determining that a claimant is not
disabled.

### Conclusion

For the reasons given, I recommend that: (1) the
Commissioner's motion for an order affirming his decision, doc.
no. 10, be denied; and (2) Mohammad's motion for an order
reversing the Commissioner's decision, doc. no. 7, be granted to
the extent that the case is remanded to the ALJ for further
proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this report and recommendation must be
filed within fourteen (14) days of receipt of this notice.
Failure to file objections within the specified time waives the
right to appeal the district court's order.  See Unauth.
Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir.

1992); United States v. Valencia-Copete, 972 F.2d 4, 6 (1st Cir. 1986).

   **SO ORDERED.**

_____
Landya McCafferty
United States Magistrate Judge


Dated:  April 4, 2011

cc:  Robert J. Rabuck, Esq.
     Jeffry A. Schapira, Esq.